In re MALDEN MILLS INDUSTRIES, INC., et al., Debtors.

Malden Mills Industries, Inc., et al., and the official Committee of Unsecured Creditors, Appellants/Cross–Appellees,

v.

Alfred G. Maroun, Appellee/Cross–Appellant.

BAP Nos. MW 03–003 to 03–009, 03–020, 03–022.
Bankruptcy Nos. 01–47214–JBR to 01–47217–JBR.
Adversary No. 02–4248–JBR.

United States Bankruptcy Appellate Panel of the First Circuit.

Jan. 21, 2004.

Kevin J. Walsh, John T. Morrier, David Hadas, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, on brief for Appellant/Cross–Appellee, Malden Mills Industries, Inc., et al.

Andrew Z. Schwartz, Richard W. Benka, Jessica M. Silbey, Foley Hoag LLP, Boston, MA, on brief for Appellant/Cross–Appellee, The Official Committee of Unsecured Creditors.

Michael B. Feinman, Stephen P. Shannon, Law Office of Michael B. Feinman, Andover, MA, on brief for Appellee/Cross–Appellant.

Before DE JESÚS, CARLO, and DEASY, U.S. Bankruptcy Appellate Panel Judges.

DEASY, Bankruptcy Judge.

# I. BACKGROUND AND PROCEDURAL HISTORY

On February 1, 1990, Malden Mills Industries, Inc. (the "Debtor") and Alfred G. Maroun ("Maroun" or the "Landlord") entered into a lease (the "1990 Lease") pursuant to which the Debtor leased 40,000 square feet in a 250,000 square foot mill building in Lawrence, Massachusetts, built around 1910 and known as the Loomweve Building (the "Building"). Under the terms of the 1990 Lease, Maroun was responsible for making "all reasonably required non-structural repairs of the leased premises" and for maintaining "the structural integrity of the leased premises and the building which the leased premises are part, including without limitation, the integrity of the roof and its support structure." In 1996, the Debtor needed additional space for one of its divisions that was destroyed by fire in December 1995. Accordingly, the Debtor and Maroun agreed to amend the lease and the Debtor was allowed to take possession of the entire Building. In order to accommodate its operations, the Debtor needed to retrofit the Building which involved removing some interior partitions and walls, cutting holes in the second floor, upgrading the electrical and plumbing services, and installing a "tank farm," i.e., a series of tanks used to mix chemicals needed to process goods. Maroun consented to these modifications in writing. · At the time of the lease amendment in 1996, the Debtor commissioned an appraisal of the Building which documented without specificity the poor condition of the Building at the time, including a leaking roof and rotting floors. The 1990 Lease, as amended, expired on August 31, 1999.

On November 1, 1999, the Debtor and Maroun entered into a new lease (the "1999 Lease"). Under the 1999 Lease, the responsibility for making structural repairs to the Building was assigned to the Debtor. The Debtor was required to maintain the Building "in as good a condition and repair as at the beginning of the Term, reasonable wear and tear only excepted." In the 1999 Lease the word "Term" is defined as the period "from November 1, 1999 and through October 31, 2006." As part of the 1999 Lease, the parties expressly agreed to rescind the 1990 Lease, the amendments thereto, and the Debtor's notice of its intention to exercise an option to purchase the Building contained in an April 4, 1996 letter.

On November 29, 2001, the Debtor filed a bankruptcy petition under Chapter 11. The Debtor promptly sought to reject the

1999 Lease. The Court approved such rejection effective January 28, 2002. Upon vacating the Building, the Debtor left personal property and debris in the Building. On January 29, 2002, in connection with the lease rejection proceedings, the Debtor notified Maroun of its intent to abandon personal property in the Building. On April 17, 2002, Maroun filed a motion seeking to compel the Debtor to pay postpetition use and occupancy charges related to the personal property left at the premises. Shortly thereafter, on April 22, 2002, the Debtor filed a motion to abandon such property.

On March 4, 2002, Maroun filed a proof of claim seeking $4,479,702.45. The claim consisted of two components: $1,965,918.45 for rent and taxes due through the end of the 1999 Lease term and $2,513,784.00 for damage to the Building resulting from alterations and deterioration. On August 2, 2002, the Debtor filed an objection to Maroun's claim.

Maroun filed a motion for summary judgment on or about September 12, 2002, requesting that the bankruptcy court grant him summary judgment as to certain matters pending in an adversary proceeding between the parties, most importantly with respect to the Debtor's objection to Maroun's claim. The Debtor filed a cross-motion seeking summary judgment in its favor. On October 24, 2002, the bankruptcy court issued an order granting summary judgment in part to the Debtor and limiting Maroun's lease rejection damages to $413,176.08.

The bankruptcy court held an evidentiary hearing on December 2 and 6, 2002, on the remaining issues raised by the parties,

specifically, the outstanding issues regarding the Debtor's objection to Maroun's claim, the Debtor's motion to abandon the personal property left in the Building, Maroun's motion to compel the Debtor to pay postpetition use and occupancy charges related to the ongoing presence of the personal property in the Building, and the Debtor's complaint against Maroun for turnover. On January 29, 2003, the bankruptcy court entered a series of orders that generated the appeals in these cases. The court reaffirmed its summary judgment findings on Maroun's lease rejection damages and capped them at $413,176.08. The court allowed Maroun's claim for damage to the Building in the amount of $2,513,784.00. The court entered an order allowing the Debtor's abandonment of the personal property left at the Building but ordered the Debtor either to remove the personal property from the Building or to reimburse Maroun for the cost of removal within thirty days of the court's order. Lastly, the court entered an order compelling the Debtor to pay Maroun use and occupancy charges of $200,002.00 [1] for the period from January 28, 2002, the effective date of the lease rejection, through January 27, 2003, as well as an additional $547.93 per day until the personal property was removed from the Building. The court further determined that the Debtor did not possess an easement to use and maintain steam pipes that run through the Building and awarded $1.00 for use and occupancy of the Building by the steam pipes.

## II. JURISDICTION

The Bankruptcy Appellate Panel (the "Panel") has jurisdiction to hear ap-

---

**1.** This amount consisted of an award of $125,000.00 based on storage of the Debtor's personal property and debris in the Building, $75,000.00 based on the presence of the tank farm, $1.00 based on the presence of steam pipes, and $1.00 to reimburse Maroun the cost of removing some of the personal property from the premises. As explained in section IV.D of this opinion at footnote 6, the bankruptcy court's award contained a mathematical error.

peals from final orders of the bankruptcy court. 28 U.S.C. § 158(a). An order sustaining an objection to claim is such an order as are orders permitting abandonment and allowing lease rejection damages. *See Neal Mitchell Assoc. v. Braunstein (In re Lambeth Corp.)*, 227 B.R. 1, 6 (1st Cir. BAP 1998) (citations omitted); *see also In re Saco Local Dev. Corp.*, 711 F.2d 441 (1st Cir.1983) (discussing bankruptcy appellate panel jurisdiction).

## III. STANDARD OF REVIEW

■■■ We review factual findings for clear error and legal conclusions *de novo*. *Werthen v. Werthen (In re Werthen)*, 329 F.3d 269, 272 (1st Cir.2003). A decision regarding abandonment is reviewed for abuse of discretion unless it is based upon a clearly erroneous finding of fact. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 634 (1st Cir.), *cert. denied*, 531 U.S. 960, 121 S.Ct. 385, 148 L.Ed.2d 297 (2000); *Johnston v. Webster (In re Johnston)*, 49 F.3d 538, 540 (9th Cir.1995).

## IV. DISCUSSION

The parties to these appeals have raised a number of interrelated issues involving the obligations of a chapter 11 debtor in possession and the claims of a lessor of nonresidential real property upon rejection of an unexpired lease and abandonment of personal property at the former leased premises. The Debtor and the official committee of unsecured creditors (the "Committee") as appellants and cross-appellees collectively raise four issues:

1. Whether the bankruptcy court erred in determining that the Debtor was liable to the Landlord for alterations and deterioration to the Building?

2. Whether the bankruptcy court erred in assessing damages for the alterations and deterioration of the Building at $2,513,784.00?

3. Whether the bankruptcy court erred in imposing use and occupancy charges and the costs of removal of abandoned personal property against the Debtor as administrative expenses?

4. Whether the bankruptcy court erred in ruling that the Debtor did not possess an easement to maintain a steam line in the Building?

The Landlord also raises four issues as appellee and cross-appellant:

5. Whether the bankruptcy court erred in limiting the Landlord's claim for breach of the 1999 Lease upon rejection to $413,176.08?

6. Whether the bankruptcy court erred in limiting the damages against the Debtor for continued use of the steam pipe to $1.00?

7. Whether the bankruptcy court erred in limiting the Landlord's claim for administrative use and occupancy charges for storage of abandoned personal property to only the portion of the Building in which such property is actually stored, rather than the entire Building?

8. Whether the bankruptcy court erred in allowing the Debtor to present the testimony of an expert as a rebuttal witness?

The factual and legal arguments surrounding these issues are interwoven in the fabric of this case and the provisions of the Bankruptcy Code.[2] Accordingly, the Panel shall discuss these issues in the context of the application of specific provisions of the Bankruptcy Code, and the policy judgments implicit in those provisions, to the

---

**2.** In this opinion the term "Bankruptcy Code" shall mean Title 11 of United States Code.

factual record established in the bankruptcy court.

For the reasons set forth in this opinion, we affirm in part, vacate in part and remand to the bankruptcy court for proceedings consistent with this opinion.

## A. Landlord's Claim for Prepetition Damage to the Building

### 1. Liability of the Debtor

The largest portion of Maroun's claim is based upon damage to the Building. Maroun's right to recover money for such damage arises under one or more of the parties' agreements, specifically, the 1990 Lease, the 1999 Lease, and any amendments thereto. Accordingly, the Panel must determine whether the bankruptcy court erred in determining that the Debtor was responsible for such damage and that Maroun was entitled to a claim for such damage in the amount of $2,513,784.00.

The construction of a contract, such as a lease, presents a question of law for the court. *Kallman v. Radioshack Corp.,* 315 F.3d 731, 735 (7th Cir.2002); *Seaco Ins. Co. v. Barbosa,* 435 Mass. 772, 761 N.E.2d 946, 951 (2002); *Great Atlantic and Pacific Tea Co., Inc. v. Yanofsky,* 380 Mass. 326, 403 N.E.2d 370, 375 (1980); *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 258 N.E.2d 786, 788 (1970). If there is no ambiguity in a contract, it must be enforced according to its terms in their usual and ordinary sense. *Citation Ins. Co. v. Gomez,* 426 Mass. 379, 688 N.E.2d 951, 952 (1998); *Freelander,* 258 N.E.2d at 788. Where a contract, such as a lease, has terms that are ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact. *Seaco Ins. Co.,* 761 N.E.2d at 951. "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning

is the proper one." *Citation Ins. Co.,* 688 N.E.2d at 953.

At the time the Debtor began to lease portions of the Building in 1990, it was responsible for the routine maintenance of the Building while Maroun was responsible for "all reasonably required non-structural repairs" and any structural repairs. This arrangement was not altered by various amendments to the 1990 Lease nor by the April 1996 letter in which Maroun consented to the Debtor's proposed modifications to the Building that would permit the Debtor to move one of its operations into the Building. At the time of the Debtor's bankruptcy filing the operative agreement between the parties was the 1999 Lease. Under the 1999 Lease, the Debtor was required to maintain the Building "in as good a condition and repair as at the beginning of the Term, reasonable wear and tear only excepted," with the Term being defined as the period "from November 1, 1999 and through October 31, 2006." Responsibility for making structural repairs to the Building was also assigned to the Debtor. As part of the 1999 Lease, the parties agreed to rescind the 1990 Lease, the amendments thereto, and the Debtor's notice of its intention to exercise the option to purchase contained in the April 1996 letter.

There is no ambiguity in the 1999 Lease regarding the obligations for maintenance and structural repairs. Under the clear terms of the 1999 Lease, the responsibility for maintenance and structural repairs fell on the Debtor. The Debtor agrees that these were its responsibilities. However, the Debtor argued below that Maroun was not entitled to his claim for damage arising out of the failure to make structural repairs because the damage that he complained of occurred prior to the term of the 1999 Lease which commenced November 1, 1999.

## 2. Measure of Damages

Under Massachusetts law, the general rule for measuring damage to real property is the diminution in market value or the cost of repair. *See Trinity Church v. John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 502 N.E.2d 532, 535 (1987); *Hopkins v. American Pneumatic Service Co.*, 194 Mass. 582, 80 N.E. 624 (1907); *see also Guar.-First Trust Co. v. Textron, Inc.*, 416 Mass. 332, 622 N.E.2d 597, 600 (1993). If the injury to real property is permanent, the measure of damages is the difference in the fair market value of the injured premises before and after the injury. *Belkus v. City of Brockton*, 282 Mass. 285, 184 N.E. 812, 813 (1933). "If the injury is reasonably curable by repairs, the expense of repairs, if less than the diminished market value, is the measure of recovery." *Id.*, 184 N.E. at 813–14. However, Massachusetts courts "have not expressly defined the concept of permanent injury to realty." *Black v. Coastal Oil New England, Inc.*, 45 Mass.App.Ct. 461, 699 N.E.2d 353, 356 (1998). As a result, most courts applying the diminution in fair market value test use repair costs as either the measure of damages or as evidence of the extent of the diminution. *See Dalton v. Demos Bros. Gen. Contractors, Inc.*, 334 Mass. 377, 135 N.E.2d 646, 647 (1956) (holding that the total cost of repairs "could be found to be a fair measure of the plaintiff's total damage"); *Hopkins*, 80 N.E. 624 (holding that in many cases cost of repair is an accurate measure of damages).

However, recovery of repair costs is limited to the reduction in market value of the premises. *Belkus*, 184 N.E. at 815 (finding that any excess over the amount necessary to cure the injury cannot be recovered). Nor can recovery of repair costs put a structure in a better condition than it was before the injury.

*Medford Hous. Auth. v. Marinucci Bros. & Co., Inc.*, 354 Mass. 699, 241 N.E.2d 834, 837 (1968). "[E]vidence of repair . . . costs may lead to an excessive award. . . ." *Commonwealth v. Massachusetts Tpk. Auth.*, 352 Mass. 143, 224 N.E.2d 186, 190 (1967). Thus, "care must be taken . . . not to permit the injured party to recover more than is fair to restore him to his position prior to his loss." *Massachusetts Port Auth. v. Sciaba Constr. Corp.*, 54 Mass. App.Ct. 509, 766 N.E.2d 118, 123 (2002).

Although the general rule for measuring property damage is diminution in market value, "market value does not in all cases afford a correct measure of indemnity, and is not therefore 'a universal test.'" *Trinity Church*, 502 N.E.2d at 535 (*quoting Wall v. Platt*, 169 Mass. 398, 48 N.E. 270 (1897)). "Where diminution in market value is unavailable or unsatisfactory as a measure of damages . . . replacement or restoration costs may be used as the appropriate measure of damages." *Sciaba*, 766 N.E.2d at 125; *see Vigorito v. Ciulla Builders, Inc.*, 57 Mass.App.Ct. 446, 783 N.E.2d 883, 887 (2003). However, if the property is "of a type, not frequently bought or sold, but usually acquired by [its owner] and developed from the ground up" or has been "adapted for . . . a specialized use," then the diminution in fair market value may not be susceptible to proof or may not be a fair and adequate measure of damages. *Sciaba*, 766 N.E.2d at 124 (*citing Newton Girl Scout Council, Inc. v. Massachusetts Tpk. Auth.*, 335 Mass. 189, 138 N.E.2d 769 (1956)). Where the evidence establishes that the property is not the type normally bought or sold or has a special use to the owner, replacement or restoration costs have been used as an appropriate measure of damages. *Trinity Church*, 502 N.E.2d at 532.

Where replacement or restoration cost is used as the measure of damages, a

test of reasonableness is imposed. *Id.*, 502 N.E.2d at 536. "Not only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant." *Id.* The test of reasonableness when restoration is used as a measure of damages is essentially the same as the depreciated cost of reproduction. The *Trinity Church* court held that the church's method of proving damages was reasonable because the reasonable cost of restoration, as proved, was consistent with the depreciated reconstruction cost standard applicable to special purpose property cases. *Id.*, 502 N.E.2d at 537.

 It is clear that the standard for measuring damage to realty in Massachusetts is diminution in market value or the cost of curing the injury, whichever is less. In unusual situations, restoration costs may be awarded but must be adjusted for depreciation and obsolescence.[3]

### 3. The Damage Award

██ At trial, the Debtor's appraiser testified that the value of the Building, as of September 24, 1999, was $645,000.00 using the sales comparison approach and $650,000.00 using the income approach. Maroun presented evidence that the cost to restore the Building to its pre-Malden occupancy was $2,513,784.00. The bankruptcy court found that the Debtor's appraiser based his values on the Building containing 166,100 square feet while the parties had agreed that the Building con-

tained approximately 250,000 square feet. Consequently, the bankruptcy court discounted the reliability of the Debtor's appraisal. The bankruptcy court rejected the Debtor's argument that it was not liable for damages to the Building prior to the commencement of the 1999 Lease based upon certain circumstances and occurrences during the term of the 1990 Lease. Specifically the bankruptcy court found that:

1. Maroun purportedly did not have access to the building after April 1996 and therefore he did not know about the level of destruction that had been visited upon his property.

2. The Debtor always led Maroun to believe that it intended to exercise its option to purchase the Building.

3. The Debtor did not notify Maroun about the deteriorating condition of the Building.

Based upon its finding that the Debtor's appraisal evidence was unreliable and the Debtor's conduct under the 1990 Lease, the bankruptcy court awarded Maroun a claim in the amount of the cost to restore the Building to its condition prior to the Debtor's occupancy.[4]

The bankruptcy court did not explain why the apparently unambiguous language of the 1999 Lease with respect to the beginning of the Term coupled with the recision of the 1990 Lease and the exercise of the option to purchase does not limit Maroun's claim for damage to the Building to injury occurring after November 1,

---

3. Where restoration is not reasonably necessary in light of the damage inflicted or the cost of restoration is unreasonable (i.e. due to obsolescence of the property), no restoration costs may be awarded. *Trinity Church*, 502 N.E.2d at 536 (*citing Puerto Rico v. The SS Zoe Colocotroni*, 628 F.2d 652, 675–76 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), and *Hopkins v.*

*American Pneumatic Serv. Co.*, 194 Mass. 582, 80 N.E. 624 (1907)).

4. It is not clear from the record on appeal whether "pre-Malden occupancy" refers to the time immediately before the beginning of the 1990 Lease or to immediately before the Debtor's occupancy of the entire Building in 1996.

1999. Even if the Debtor's appraisal evidence was unreliable, the bankruptcy court did not explain why the cost of restoration of the Building is the proper measure of damages under Massachusetts law without any determination of the reasonableness of such restoration in light of the character of the Building.[5] *See Trinity Church,* 502 N.E.2d at 536–37.

Accordingly, the portion of the bankruptcy court's order allowing Maroun's claim in the amount of $2,513,784.00 shall be vacated and the determination of Maroun's claim for damages to the Building shall be remanded to the bankruptcy court for proceedings consistent with this opinion.

## B. Debtor's Abandonment of Personal Property in the Building

### 1. Effective Date of Abandonment

The Debtor filed a motion to abandon personal property and fixtures located in the Building on April 22, 2002. The bankruptcy court entered an order allowing the Debtor's abandonment on January 29, 2003, but ordered the Debtor either to remove the personal property from the Building itself or to reimburse Maroun for the cost of its removal within thirty days of the court's order. The Debtor and the Committee have appealed that order on the grounds that the bankruptcy court erred in not permitting retroactive abandonment of the personal property and by conditioning the Debtor's abandonment where such property was not necessary for the preservation of the Debtor's estate. Maroun did not appeal the Court's order allowing the Debtor to abandon the property.

Section 554 of the Bankruptcy Code provides that "[a]fter notice and a hearing, [a debtor in possession] may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." Upon abandonment the property reverts to the party with the possessory interest. *In re A.J. Lane & Co., Inc.,* 133 B.R. 264, 268 (Bankr.D.Mass.1991) *(citing* H.R.Rep. No. 95–595 (1977), and S.Rep. No. 95–989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5878, 5963, 6333); *In re Wilson,* 94 B.R. 886, 888 (Bankr.E.D.Va. 1989) *(citing* S.Rep. No. 95–989 (1978)).

The Debtor argues that it provided notice of its abandonment of the property in a pleading dated January 29, 2002, entitled "Response of Debtors to Motion by Alfred G. Maroun for Relief from Judgment or Order and Request for Authority to Abandon Certain Property," in which it indicated its intent to abandon the tanks, after appropriate notice under the federal and local bankruptcy rules had been provided. The Debtor filed a separate motion to abandon on April 22, 2002, in which it asked the bankruptcy court to authorize and approve the abandonment of all property at the Building, other than property subject to its alleged utilities easement for the steam pipes, as of January 28, 2002, the date the 1999 Lease was deemed rejected. In its oral decision, the bankruptcy court did not order abandonment retroactive to January 28, 2002, or to April 22, 2002, the date the motion was filed; rather, it appears to have ordered abandonment effective January 29, 2003, the date of its order, subject to further conditions regarding removal and reimbursement.

In *Thinking Machines Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Ma-*

---

**5.** In this case, the record is devoid of evidence of the Building being used for a specialized purpose.

*chines Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995), the Court of Appeals for the First Circuit held that bankruptcy court approval is a condition precedent to the effectiveness of a trustee's or a debtor in possession's rejection of a nonresidential lease under 11 U.S.C. § 365(a) and therefore the date of court approval, not the motion filing date, controls the issue of a debtor's liability for administrative rent. The court of appeals further ruled that a bankruptcy court can approve the rejection of a nonresidential lease retroactive to the motion filing date in an appropriate case. *Id.* The Debtor argues that the rationale of *Thinking Machines* regarding retroactive approval can and should be applied in the abandonment context.

■■■ While the Panel agrees with the Debtor, the Debtor's argument ignores a statutory distinction between the rejection of a real estate lease and the abandonment of personal property by a trustee. Section 365(a) provides that a trustee may assume or reject an executory contract or unexpired lease "subject to the court's approval." Section 554 provides that "after notice and a hearing" the trustee may abandon property of the estate. The language in these two sections of the Bankruptcy Code is not identical. Assumption or rejection of an executory contract or unexpired lease is explicitly subject to the court's approval while abandonment of property does not require court approval unless challenged by a party in interest. *See Erickson v. Baxter Healthcare, Inc.*, 94 F.Supp.2d 907, 914 (N.D.Ill.2000) ("A trustee may abandon property without involvement of the court if no party in interest objects to the action."); *In re Terjen*, 154 B.R. 456, 458 (E.D.Va.1993) ("Unless a timely objection is made, court approval is not required for abandonment."), *aff'd*, 30 F.3d 131 (4th Cir.1994); *In re Slack*, 290 B.R. 282, 284 (Bankr.D.N.J.2003) ("Courts

defer to the trustee's judgment and place the burden on the party opposing the abandonment to prove a benefit to the estate and an abuse of the trustee's discretion.... The court only needs to find the trustee made: 1) a business judgment; 2) in good faith; 3) upon some reasonable basis; and 4) within the trustee's scope of authority."); *In re Interpictures, Inc.*, 168 B.R. 526, 535 (Bankr.E.D.N.Y.1994) ("[A]bandonment is in the discretion of the trustee, bounded only by that of the court."); *In re Tucci*, 47 B.R. 328, 331 (Bankr.E.D.Va.1985) (explaining that a hearing on abandonment is required only if an objection to the proposed abandonment is filed because "notice and a hearing" under 11 U.S.C. § 102(1) means such notice and such opportunity for a hearing as is appropriate in the particular circumstances).

■■■ Accordingly, where abandonment has been challenged and thus is subject to review by the court, the date of any approved abandonment should be the date the notice or motion for abandonment was filed. However, in light of the decision in *Thinking Machines*, a bankruptcy court may, based upon specific findings and an appropriate record, order that such abandonment should have either retroactive or prospective effect. Because the bankruptcy court failed to explain why it ordered abandonment effective the date of its order the Panel vacates that portion of the abandonment order awarding a priority administrative claim for use and occupancy and determining January 29, 2003 as the effective date of abandonment. On remand the bankruptcy court should consider the effective date of the Debtor's abandonment in light of this opinion and the decision of the First Circuit in *Thinking Machines*.

### 2. Conditions on Abandonment

■■■ With respect to the bankruptcy court's conditioning the Debtor's abandon-

ment, given the bankruptcy court's factual findings, no basis exists under the Bankruptcy Code to condition the Debtor's abandonment of the personal property in the Building upon the Debtor's removal of the property from the Building or the Debtor's reimbursing Maroun for the cost of removal, with such expense or reimbursement being paid on an administrative basis. In *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the Supreme Court held that "[t]he Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." 474 U.S. at 506–07, 106 S.Ct. 755. However, the Supreme Court noted that "[t]his exception to the abandonment power vested in the trustee by § 554 is a narrow one." 474 U.S. at 507 n. 9, 106 S.Ct. 755.

The bankruptcy court did not make a finding that the property left behind in the Building, which the Debtor sought to abandon to Maroun, posed an imminent threat to the public's health and safety nor did the court articulate any other basis for imposing conditions as an exception to the abandonment power vested in a trustee or debtor in possession. In the absence of sufficient reason for limiting the abandonment power of the debtor in possession, the Panel must vacate that portion of the bankruptcy court's order imposing conditions (i.e. removal of abandoned property) on abandonment. The Panel will address below whether, as a separate matter from the abandonment issue under § 554, the Debtor should be obligated to pay as an administrative expense the cost to have the abandoned property removed from the Building.

## C. Landlord's Damages for Debtor's Rejection of the 1999 Lease

Section 365(d)(4) of the Bankruptcy Code provides that a nonresidential real property lease shall be deemed rejected unless it is assumed within sixty days after the order for relief. Section 365(g) of the Bankruptcy Code deals with the effect of rejecting an unexpired lease and provides that rejection constitutes breach of the lease immediately before the date of the filing of the petition. Rejection of a lease under § 365 is the equivalent of a termination by breach. Lawrence P. King, *Collier on Bankruptcy* ¶ 502.03[7][b] (15th rev. ed.2003). The effect of such a breach is to permit a landlord, such as Maroun, to seek the allowance of its claim under § 502. *See In re Fin. News Network, Inc.*, 149 B.R. 348, 350 (Bankr.S.D.N.Y. 1993). Rejection does not affect the parties' substantive rights under the contract or lease, such as the amount owing or a measure of damages for breach. Lawrence P. King, *Collier on Bankruptcy* ¶ 365.09[2]. Consistent with § 365(g), § 502(g) of the Bankruptcy Code provides that claims resulting from the rejection of an unexpired lease relate back to the date of the filing of the petition. *Mason v. Official Comm. of Unsecured (In re FBI Distrib. Corp.)*, 330 F.3d 36, 42 (1st Cir. 2003) ("If the contract is rejected . . ., the contract is deemed breached on the date 'immediately before the date of the filing of the petition,' 11 U.S.C. § 365(g)(1), and the nondebtor party has a prepetition general unsecured claim for breach of contract damages, one not entitled to administrative priority, 11 U.S.C. § 502(g)."). Under the statute, postpetition rejection fixes the liability of the debtor and, therefore, the recovery of the creditor, as of the petition date. Lawrence P. King, *Collier on Bankruptcy* ¶ 502.08[1].

Section 502(b)(6) limits the claim that a landlord may have for damages resulting from the termination of a lease.

The claim of the landlord for damages resulting from termination of a lease is

limited to the rent reserved by the lease, without acceleration, for the greater of either one year or 15 percent, not to exceed three years, of the remaining lease term following the earlier of the petition date or the date on which the landlord repossessed or the lessee debtor surrendered the property. In addition, the landlord is afforded a claim for any unpaid rent due under a lease, without acceleration, as of either the date of the filing of the petition or the date on which the landlord repossessed the premises or the lessee surrendered them, whichever is earlier.

Lawrence P. King, *Collier on Bankruptcy* ¶ 502.03[7][a].

In the instant case, the Debtor's rejection of the 1999 Lease was effective January 28, 2002, sixty days after the Debtor filed bankruptcy. The bankruptcy court ruled pursuant to § 502(b)(6) that Maroun's damages arising from the Debtor's rejection were capped at $413,176.08. The court based its ruling on the Debtor's admission that one year's rent totaled $413,176.08, which amount was greater than the rent owed for fifteen percent of the remaining term under the 1999 Lease.

 The Landlord has appealed the bankruptcy court's order on the grounds that the court erred in ruling that the 1999 Lease was a true lease and not a lease intended as security and that therefore the cap of § 502(b)(6) applied. In making its decision, the bankruptcy court reviewed the record before it wherein consistently from the beginning of the Debtor's Chapter 11 proceedings Maroun had characterized the 1999 Lease as a true lease. The Panel does not find that the bankruptcy court committed clear error. It is apparent from the record that Maroun claimed the lease was intended as security only at some later date in the Debtor's case. Maroun never raised the issue in the context of the Debtor's lease rejection motion, Maroun's motion for relief from the court's rejection order, the parties' stipulated order regarding lease rejection, Maroun's motion to compel payment of postpetition use and occupancy charges, his response to the Debtor's motion to abandon property, or the parties' amended joint stipulation filed prior to the evidentiary hearings held in December 2002. For that reason, the bankruptcy court did not err in concluding that Maroun was judicially estopped from raising the issue. The bankruptcy court's determination of the damages awarded to Maroun under § 502(b)(6) shall be affirmed.

## D. Administrative Claim for Post-rejection Use and Occupancy

The bankruptcy court determined that the Debtor continued to occupy the Building post-rejection by virtue of leaving substantial quantities of personal property on the premises and, therefore, Maroun had an allowed administrative claim in the amount of $200,002.00 plus $547.93 per day after January 28, 2003. However, the bankruptcy court made a mathematical error in calculating the amount of the claim; under the court's rationale the administrative claim should total $187,502.00 in addition to a per day charge of $513.70.[6] The

---

**6.** The bankruptcy court stated that it was awarding an administrative claim for use and occupancy "based upon the approximate rental rate for the space actually used." Transcript at 14. The bankruptcy court considered the testimony of each side's experts and determined that on an annual basis $2.50 per square foot was reasonable. The bankruptcy court then determined that the Debtor continued to use 50,000 square feet in the Building for storage of debris and 25,000 square feet based on the presence of the tank farm for a total of 75,000 square feet. The bankruptcy court then arrived at a claim of

determination of whether Maroun has an administrative claim for post-rejection use and occupancy is a two step process. The first step is the determination of whether Maroun has a claim for damages under the Bankruptcy Code or applicable state law. The second step involves an analysis under the administrative expense provisions of the Bankruptcy Code.

### 1. Claim for Use and Occupancy

 The test described by § 502(b)(6) is the exclusive test concerning damage claims of landlords for termination of leases of real property; however, this section does not purport to limit administrative expense claims by landlords based upon postpetition use of the leased premises. Lawrence P. King, *Collier on Bankruptcy* ¶ 502.03[7][g]. Prior to rejection, the Bankruptcy Code requires the debtor in possession to timely perform all of the obligations under a lease. *See* 11 U.S.C. § 365(d)(3). Once a lease is rejected, the lessor's rights under § 365(d)(3) cease. *In re Almac's, Inc.*, 167 B.R. 4, 8 (Bankr. D.R.I.1994); *see also In re Roberds, Inc.*, 270 B.R. 702, 705 (Bankr.S.D.Ohio 2001) ("Once the lease is rejected, the contractual terms of the lease no longer obligate a debtor."); *In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415, 417 (D.Mass. 1987) (noting that § 365(d)(4) is silent as to a debtor's obligations to a landlord once the lease has been rejected). Post-rejection a landlord may have an unsecured claim under applicable state law.

 Upon termination of the 1999 Lease on January 28, 2002, the Debtor had an obligation under state law and the 1999 Lease to return the Building to Maroun free from personal property. *First Republic Corp. of Am. v. BayBank*, 424 Mass. 704, 677 N.E.2d 1146, 1149 (1997). To the extent that the Debtor continued to use and occupy the Building post-termination, the Debtor became a tenant at sufferance under Massachusetts law. *See, e.g., Dale v. H.B. Smith Co., Inc.*, 136 F.3d 843, 847–48 (1st Cir.1998); *Cumberland Farms, Inc. v. Montague Econ. Dev. and Indus. Corp.*, 78 F.3d 10, 12 (1st Cir.1996). Massachusetts law provides that a tenant at sufferance is liable for the reasonable worth of its use and occupancy and/or detention of the premises. *Dale*, 136 F.3d 843, 847–48 (*citing* Mass. Gen. Laws c. 186, § 3 ("Tenant at sufferance in possession of land or tenements shall be liable to pay rent therefor for such time as they may occupy or detain the same."); *Lowell Hous. Auth. v. Save–Mor Furniture Stores, Inc.*, 346 Mass. 426, 193 N.E.2d 585, 588 (1963) ("The liability of a tenant at sufferance is not to be determined arbitrarily by the rent fixed in the lease with the . . . owner, but rather is the sum which the trier of fact finds the use and occupation were reasonably worth.")). *See also Cumberland Farms, Inc.*, 78 F.3d at 12 (affirming the bankruptcy court's award of the fair rental value of the tenant's continued use and occupancy of premises follow-

---

$200,002.00 (which also included $1.00 for use and occupancy based on the presence of the steam pipes and $1.00 as nominal reimbursement to Maroun for the cost of removing some of the Debtor's personal property from the Building). The Panel finds that the bankruptcy court erred mathematically in computing the amount of the claim for use and occupancy of the Building based on its own formula and that the award should have totaled $187,502.00 (75,000 s.f. times $2.50

plus $2.00). Similarly the per diem charge should have totaled $513.70 ($187,500.00 divided by 365). The Panel finds no error in the bankruptcy court's award of $1.00 for the cost of removing some of the Debtor's personal property from the Building and $1.00 for the Debtor's continued use of the steam pipes, which have not been abandoned by the Debtor, assuming that such pipes are personal property of the Debtors and not fixtures.

ing a taking of the owner's property by eminent domain); *Kobayashi v. Orion Ventures, Inc.*, 42 Mass.App.Ct. 492, 678 N.E.2d 180, 187–88 (1997) (affirming the lower court's determination that the tenant had become a tenant at sufferance during the holdover period and that the correct measure for a use and occupancy charge was the then current fair rental value of the premises); *Bruce v. Harvard Trust Co.*, 1 Mass.App.Ct. 373, 298 N.E.2d 880, 881 (1973) ("Such use of the premises for storage entitles the owner to compensation in the amount of the fair rental value of the premises of which he was deprived by such use."). *Cf. Lawrence v. Osuagwu*, 57 Mass.App.Ct. 60, 781 N.E.2d 50, 54 (2003) (holding that the damage for tenancy at sufferance during the holdover period was the monthly rent under the lease versus the apartment's fair market value because the lease contained a provision requiring lease payments beyond the lease term).

 The basis of liability for use and occupancy by a tenant at sufferance is the tenant's continued control over the premises which effectively deprives the owner of the use of the property. *Lowell Hous. Auth.*, 193 N.E.2d at 588. Thus, a tenant who does not remove its property from the leased premises after a tenancy is terminated may be liable to the owner for the expenses of storage. *Bruce*, 298 N.E.2d at 881. Fixing a reasonable value normally entails a pure finding of fact which is reviewed for clear error. *Dale*, 136 F.3d at 850. The rent under the earlier lease agreement may or may not provide a reasonable valuation standard for the subsequent use and occupancy. *Id.*

 The bankruptcy court awarded what it considered an appropriate use and occupancy charge for that portion of the Building used and occupied by the Debtor's personal property during the period between lease rejection and the time the property was to be removed from the Building. The Panel finds no error in the bankruptcy court making an award based upon only the space actually used by the Debtor and not the entire Building. The bankruptcy court's decision does not reflect, however, any consideration of Maroun's duty to mitigate damages. In Massachusetts, commercial landlords have a common law duty to mitigate the damage caused by a holdover tenant. *Krasne v. Tedeschi and Grasso*, 436 Mass. 103, 762 N.E.2d 841, 846–47 (2002). *See also* 33A Mass. Prac. Landlord and Tenant Law § 15:27 (3d ed.2003). A landlord can mitigate damages in several ways, which can include removing a holdover tenant's personal property, reletting the premises, and even selling the property. *See Krasne*, 762 N.E.2d at 847; *see also First Republic Corp. of Am. v. BayBank*, 424 Mass. 704, 677 N.E.2d 1146, 1148 n. 5 (1997) (noting that upon the termination of a commercial lease, the landlord could have moved the equipment left by the tenant into storage, provided it was done in a commercially reasonable manner, and made a claim in the tenant's bankruptcy proceeding for moving and storage). Any determination regarding the reasonableness of a landlord's actions to mitigate damages post-termination presents a question of fact for the trial court. *Dowse v. Brockunier*, 1992 Mass.App. Div. 44, 1992 WL 64767, at *4 (Mass.App.Div.1992). The cost of mitigation to a landlord is chargeable to the original tenant, *Krasne*, 762 N.E.2d at 846, and therefore such cost would become part of the landlord's claim in bankruptcy.

 In addition, any determination regarding Maroun's claim for the value of the Debtor's continued use and occupancy of the Building after lease termination will be affected by the bankruptcy court's decision regarding the effective date of the Debtor's abandonment of the property.

Under Massachusetts law, upon vacating the premises, a tenancy at sufferance is terminated and the tenant is no longer liable to the owner for any use and occupancy or detention of the premises. *Dale*, 136 F.3d at 849. Once the property is vacated and abandoned the Debtor no longer would be considered a holdover tenant and therefore Maroun would not be entitled to any further claim for use and occupancy damages.

The failure to consider the impact of Maroun's duty to mitigate damages or the impact of Massachusetts law after the effective date of the Debtor's abandonment of the property would constitute a reversible error of law. If the bankruptcy court did consider those provisions of Massachusetts law on the allowed claim for post-rejection damages, the Panel is unable to review the bankruptcy court's decision in the absence of any discussion or analysis by the bankruptcy court. Accordingly, the bankruptcy court's determination of the amount of damages for post-rejection use and occupancy shall be vacated and remanded for proceedings consistent with this opinion.

### 2. Administrative Priority of Claim for Use and Occupancy

▇▇▇▇ Under § 503(b)(1) a landlord may be entitled to a priority administrative claim for services provided during the postpetition, post-rejection period. Lawrence P. King, *Collier on Bankruptcy* ¶ 502.08[2][a] ("If pursuant to an executory contract or lease, a debtor has possession of property of a nondebtor party, section 502(g) does not preclude the nondebtor party from seeking an allowed administrative expense for the value of the use of its property between the date of the filing of a debtor's petition and the date of the surrender by the debtor of the property. This is because the basis for the potential administrative expense claim does not depend upon the terms of the provisions of the rejected contract or lease but rather arises under the standards contained in section 503 of the Bankruptcy Code."). Thus, "[t]he failure to 'immediately surrender' the premises after a debtor rejects a lease may create an administrative rent claim and other consequences for a debtor .... § 503(b)(1)(A) governs the determination of postpetition rent owed to a lessor for the period after rejection of the lease until the property is vacated." *Roberds, Inc.*, 270 B.R. at 706; *see also Nat'l Record Mart, Inc. v. Watercress Assocs. Joint Venture 315089 (In re Nat'l Record Mart, Inc.)*, 272 B.R. 131, 135 (Bankr.W.D.Pa. 2002) (*quoting Roberds*, 270 B.R. at 704–06). "When the debtor becomes a holdover tenant under a lease, the administrative expense that accrues from debtor's continued use of the premises is treated differently than pre-rejection administrative expense claims. Claims for rent and other charges that accrue after the date of rejection and while debtor remains in possession of the premises fall under § 503(b)...." *In re Trak Auto Corp.*, 277 B.R. 655, 666 (Bankr.E.D.Va.2002), *aff'd, LaSalle Nat'l Trust, N.A. v. Trak Auto Corp.*, 288 B.R. 114 (E.D.Va.2003).

▇▇▇▇ Section 503(b)(1)(A) provides that the bankruptcy court shall permit as an administrative expense "the actual, necessary costs and expenses of preserving the estate." The First Circuit Court of Appeals has stated that "[i]n general, for a claim to qualify as an administrative expense under subsection 503(b)(1)(A), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *Mason v. Official Comm. of Unsecured (In re*

*FBI Distrib. Corp.),* 330 F.3d 36, 42 (1st Cir.2003) (*citing Woburn Associates v. Kahn (In re Hemingway Transp., Inc.),* 954 F.2d 1, 5 (1st Cir.1992); *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir. 1976)). "Where the debtor in possession ... induces a nondebtor to render performance pursuant to an *unassumed* prepetition executory contract, pending its decision to reject or assume, the nondebtor party will be entitled to administrative priority only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate." *FBI Distrib. Corp.,* 330 F.3d at 42–43 (citations omitted) (emphasis in original). The burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it as the traditional presumption favoring ratable distribution among all unsecured creditors requires strict construction of provisions governing requests for priority payment of administrative expenses. *Id.* at 42; *Hemingway Transp.,* 954 F.2d at 4–5.

■■■ The First Circuit Court of Appeals has relied upon the United States Supreme Court's statements in *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), to extend the reach of § 503(b)(1) to include those costs "ordinarily incident to operation of a business" and to not limit them to costs "without which rehabilitation would be impossible." *Commonwealth of Massachusetts Div. of Employment & Training v. Boston Reg'l Med. Ctr. (In re Boston Reg'l Med. Ctr.),* 291 F.3d 111, 125 (1st Cir.2002) (*quoting Reading Co.,* 391 U.S. at 483, 88 S.Ct. 1759). The Supreme Court "reasoned that a bankruptcy estate is operated for the benefit of its general creditors, and those injured by the operation of the estate should be made whole before the creditors receive their own shares." *Id.* at 124 (*citing Reading Co.,* 391 U.S. at 482–83, 88 S.Ct. 1759; *Mammoth Mart,* 536 F.2d at 955) ("When a the debtor-in-possession commits a tort ... or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.") (citations omitted).

This circuit has extended the rule of *Reading Co.* to cover a civil compensatory fine imposed in a state court nuisance action ...; costs incurred by a purchaser of contaminated property from the debtor-in-possession for which the debtor-in-possession was liable under federal environmental law ...; and penalties imposed by state environmental law.... *Boston Reg'l Med. Ctr.,* 291 F.3d at 124–25 (citations omitted). This special category of expenses entitled to administrative priority status is based upon consideration of "fundamental fairness." *Hemingway Transp.,* 954 F.2d at 5.

The First Circuit Court of Appeals has clearly stated that granting priority status to creditors is contrary to the fundamental principle of bankruptcy law that a debtor's limited resources should be distributed equally among similarly situated creditors and thus statutory priorities should be narrowly construed. *FBI Distrib. Corp.,* 330 F.3d at 41–42. Any claim for use and occupancy by Maroun results from the Debtor's prepetition conduct. Prepetition the Debtor entered into several leases with Maroun for use of the Building. The Debtor apparently vacated the premises around the time it filed its bankruptcy petition and it timely requested that the 1999 Lease be rejected. The Debtor did not continue any of its business operations from the premises. Rather, upon vacating the Building, the Debtor left various stor-

age tanks and debris on the premises which Maroun then had to store and/or remove and for which he sought to be paid. Maroun and the Debtor did not enter into any postpetition, post-rejection lease for the Building.

The Panel finds *Woburn Associates v. Kahn (In re Hemingway Transp., Inc.),* 954 F.2d 1, 7 (1st Cir.1992), particularly persuasive in this case because the genesis of Maroun's claim was the prepetition lease of the Building, not some dealings resulting from the postpetition operation of Malden Mills' business. For that reason, it would appear that neither fundamental fairness nor economic necessity warrants the allowance of any claim on a priority basis under § 503(b)(1)(A) of the Bankruptcy Code for use and occupancy of the Building after the 1999 Lease was rejected on account of the presence of abandoned personal property in the Building. *See id.* at 6. The Panel makes no comment on whether under a different set of facts a landlord may have an administrative claim entitled to priority based on post-lease rejection use and occupancy of the premises. *See In re FBI Distrib. Corp.,* 330 F.3d 36 (1st Cir.2003) (wherein the First Circuit Court of Appeals held that a company executive who was terminated by a Chapter 11 debtor after rendering postpetition services was not entitled to payment of termination benefits owed to her pursuant to prepetition employment and retention agreements on a first priority administrative basis because the severance pay was not a component of her compensation for services; she was entitled only to the reasonable value of her postpetition services that benefitted the estate; and her claim under the retention agreement was a prepetition claim even though the right to payment arose postpetition); *In re TSB, Inc.,* 302 B.R. 84 (Bankr.D.Idaho 2003) (awarding an administrative expense claim for post-rejection use of premises by Chapter 7 trustee based upon benefit to the estate).

In making its determination that the Debtor should be responsible, on an administrative basis, for paying Maroun use and occupancy based on the presence of personal property in the Building after the 1999 Lease was deemed rejected, the bankruptcy court stated simply that it would be "unfair" for the Debtor to shift the cost for cleanup and removal to Maroun. Transcript at 19. However, both the record below and the bankruptcy court's decision were devoid of evidence or analysis of the requirements of § 503(b)(1)(A) and whether the estate received a benefit from leaving personal property and debris in the Building after rejection of the lease. In the absence of any postpetition business activities by the Debtor in the Building or any exigent circumstance such as an imminent threat to public health or safety, it is difficult to find a basis for any allowed claim for post-rejection damages to be entitled to administrative priority. Accordingly, that portion of the bankruptcy court's order awarding a priority administrative claim to Maroun for any post-rejection damages shall be vacated and remanded to the bankruptcy court for further proceedings consistent with this opinion.

### E. Debtor's Claim of Easement for Steam Pipes

"An easement is an interest in land which grants one person the right to use or enjoy land owned by another." *Cheever v. Graves,* 32 Mass.App.Ct. 601, 592 N.E.2d 758, 761 (1992) (*quoting Commercial Wharf East Condominium Ass'n v. Waterfront Parking Corp.,* 407 Mass. 123, 552 N.E.2d 66 (1990)). The Debtor has challenged the bankruptcy court's determination that the Debtor does not possess an express easement to use and main-

tain steam pipes that run through the Building. The Debtor argues that the bankruptcy court's decision is contrary to the evidence. In addition, the Debtor asserts that the court erred by not permitting the Debtor's expert to rely on a title policy and other documents of record in reaching his opinion that the Debtor had a proper easement. Maroun argues that the bankruptcy court erred in even allowing the Debtor to introduce rebuttal expert testimony.

 "The decision to allow or foreclose rebuttal evidence rests squarely within the informed discretion of the district court." *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir.1999) (citing *United States v. LiCausi*, 167 F.3d 36, 52 (1st Cir.1999); Fed.R.Evid. 611(a) (confirming the trial judge's authority over the order of proof)). "Appellate courts traditionally afford trial courts a wide berth in respect to regulating the scope of rebuttal testimony." *United States v. Sebaggala*, 256 F.3d 59, 66 (1st Cir.2001) (citing *Geders v. United States*, 425 U.S. 80, 86–87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir.1999)). We review challenges to such rulings for abuse of discretion. *Faigin*, 184 F.3d at 85; *LiCausi*, 167 F.3d at 52. We find none here.

 The bankruptcy court's factual findings underlying its decision that the Debtor did not possess an express easement are reviewed for clear error while its legal conclusion as to the nonexistence of the express easement is entitled to plenary review. *See Gallo–Mure v. Tomchik*, 78 Conn.App. 699, 829 A.2d 8, 12 (2003). Here, the bankruptcy court did not find an express easement because the Debtor¹ failed to establish with evidence in the record that the Debtor possessed an ex-

press easement to use and relocate steam pipes in the Building.[7] The Panel agrees that the evidence presented by the Debtor on the easement issue was incomplete and failed to demonstrate the actual existence of an easement in favor of the Debtor. The Debtor's expert relied upon a title policy and not the actual documents in the Building's chain of title in reaching its conclusion. The colloquy between the expert and the bankruptcy court demonstrate that there were gaps in the title and that the expert was simply explaining his assumption that an easement exists. For these reasons, the Panel shall affirm the bankruptcy court's decision on the easement issue and the admission of expert rebuttal testimony. Based upon the evidentiary record before the bankruptcy court, the Panel also affirms the bankruptcy court's nominal award of $1.00 in damages to Maroun based on the Debtor's continued use of the steam pipes as Maroun failed to present any evidence that would support a larger award.

## V. CONCLUSION

For the reasons discussed above, the Panel's conclusions regarding the issues raised on appeal are as follows:

1. That portion of the bankruptcy court's order determining that Maroun had a claim for deterioration to the Building is vacated and remanded to the bankruptcy court for proceedings consistent with this opinion.

2. That portion of the bankruptcy court's order determining Maroun's claim for deterioration to the Building at $2,513,784.00 is vacated and remanded to the bankruptcy court

---

**7.** As the party asserting the existence of the easement, the Debtor had the burden of proof on the issue. *See Swensen v. Marino*, 306

Mass. 582, 29 N.E.2d 15, 17 (1940); *Foley v. McGonigle*, 3 Mass.App.Ct. 746, 326 N.E.2d 723, 724 (1975).

for proceedings consistent with this opinion.

3. That portion of the bankruptcy court's order determining the amount and priority of Maroun's claim arising from the abandonment of property located in the Building is vacated and remanded to the bankruptcy court for proceedings consistent with this opinion.

4. The bankruptcy court's determination that the Debtor did not possess an easement to maintain a steam line in the Building is affirmed.

5. The bankruptcy court's determination of Maroun's claim for damages arising from the rejection of the 1999 Lease at $413,176.08 is affirmed.

6. The bankruptcy court's determination of Maroun's damages arising from the continued use and occupancy by the Debtor's steam pipes at $1.00 is affirmed.

7. The bankruptcy court's determination that Maroun's damage claim based upon use and occupancy charges for storage of abandoned personal property to only the portion of the building in which such property is actually stored, rather than the entire building, is affirmed.

8. The bankruptcy court's decision to permit the Debtor to present the testimony of an expert as a rebuttal witness on the steam pipe easement issue is affirmed.